IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MOHAMAD HARIRI,

      Plaintiff,

                                      3:15-CV-1076-PK

v.                                  OPINION AND
                                            ORDER

PORTLAND STATE UNIVERSITY,

      Defendant.

PAPAK, Magistrate Judge:

      Plaintiff Mohamad Hariri filed this action against defendant Portland State University

("PSU") and against PSU professor Gwen Shusterman on June 17, 2015. Effective July 12,

2016, Hariri amended his complaint, abandoning his claims against Shusterman. By and through

his amended complaint, Hariri alleges that he was baselessly accused of academic misconduct, in

Page 1 - OPINION AND ORDER

consequence of which he was suspended for one year from attendance at PSU and received a

lower than deserved grade in one of his classes. Arising out of the foregoing, Hariri alleges

PSU's liability (i) under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) for

unlawful discrimination based on race, color, and/or national origin, (ii) under 42 U.S.C. § 1983

for the violation of his Fourteenth Amendment procedural due process rights, and (iii) under

Oregon common law for negligence. Hariri seeks award of economic damages in the amount of

$160,000 plus an additional amount for unspecified medical expenses, award of non-economic

damages in the amount of $200,000, award of punitive damages in the amount of $200,000, post-

judgment interest on all money damages, award of his attorney fees and costs, injunctive relief

requiring defendants to reverse his suspension, raise his grade in one of his classes, expunge the

accusation of misconduct and the suspension from his academic record, train all "managers and

HR staff" at PSU to undergo counseling and training regarding illegal discrimination, and update

PSU policies regarding "treatment of minorities." This court has federal-question jurisdiction

over Hariri's federal claims pursuant to 28 U.S.C. § 1331, and may properly exercise

supplemental jurisdiction over Hariri's state-law claim pursuant to 28 U.S.C.

§ 1367 for so long as Hariri's federal claims remain properly before it.

Now before the court is PSU's motion (#54) for summary judgment. I have considered

the motion and all of the pleadings and papers on file. For the reasons set forth below, PSU's

motion is granted in its entirety, and summary judgment is entered in PSU's favor as to each of

Hariri's claims.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiff Hariri is an American of Arab descent, specifically of Lebanese and Syrian ancestry. Defendant PSU is a public, nonprofit educational institution. It is undisputed that PSU

receives portions of its funding from the State of Oregon and from the federal government, among other sources.

## II.    Material Factual History[1]

Plaintiff Hariri enrolled as a full-time undergraduate student at PSU in Fall 2009, prior to which he spent two academic years as an undergraduate studying at a community college in Oregon.[2] *See* Declaration (#26) of Nicolle DuPont dated March 1, 2016 ("DuPont Decl."), Exhs. 5, 6. Although Hariri received failing grades, only marginally passing grades, and marks indicating the absence of any basis for evaluating academic performance in some of his coursework, he nevertheless ultimately graduated from the undergraduate program offered by defendant PSU with a bachelor's degree in general science in 2013. *See id.*, Exh. 1. After graduation from PSU, Hariri applied unsuccessfully to dental schools, during the course of which process he learned that the presence of failing grades on his college transcript could negatively impact his applications. *See id.*, Exh. 7. In consequence, beginning in 2014 Hariri began petitioning PSU both to expunge from his transcript courses in which he completed none of the work and to permit him to retake classes in which he received failing or nearly failing grades. *See id.*, Exhs. 3, 7. PSU denied several such petitions, but in September 2014 granted Hariri the opportunity to retake four courses in which he had previously received poor grades. *See id.*,

_____

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

[2] This was Hariri's second effort to pursue studies at PSU, his first effort having ended in dismissal for failure to meet academic criteria for continued enrollment. *See* Declaration (#21) of Darian Stanford dated March 1, 2016 ("Stanford Decl."), Exh. 1 (the Deposition of Mohamad Hariri (collectively with the Declaration (#56) of P. K. Runkles-Pearson dated October 21, 2016 ("Runkles-Pearson Decl."), Exh. 1, "Hariri Depo."), 65:18 – 66:11.

Exhs. 4, 7. In Fall 2014, Hariri enrolled at PSU as a post-baccalaureate student for the purpose

of retaking those four courses. *See id.*, Exh. 1.[3]

Among the courses Hariri retook in Fall 2014 was General Chemistry I, also known as

Chemistry 221, which was taught by former defendant Shusterman. *See id.* Because over 350

students were enrolled in Chemistry 221 in that quarter, the students were divided into groups (or

"neighborhoods") of approximately 20, each of which was assigned a "learning assistant" or

"LA." Runkles-Pearson Decl., Exh. 5 (the Deposition of Dillon Willis (collectively with

Stanford Decl., Exh. 4, "Willis Depo."), 6:9 – 7:21; *see also* Declaration (#22) of Gwen

Shusterman dated March 1, 2016 ("Shusterman Decl."), ¶¶ 3-4. The learning assistant assigned to

Hariri's "neighborhood" was Dillon Willis. *See* Willis Depo., 6:9 – 7:21; *see also* Shusterman

Decl., ¶ 5.

The final examination for Chemistry 221 was scheduled for December 8, 2014. *See*

Shusterman Decl., Exh. 4. Pursuant to Shusterman's written policy, students were required to

bring photographic identification documents to the final examination. *See id.*, Exh. 5. Also

pursuant to Shusterman's written policy, Chemistry 221 students were advised that the final

examination could be rescheduled for students who had a conflict with the regular schedule, and

that "[i]llness. . . and family emergencies" (*inter alia*) were considered valid grounds for

rescheduling the final examination. *See id.*, Exh. 4. In addition, Chemistry 221 students were

advised in writing at the beginning of the term that "[Shusterman] trust[ed] that the work

[students] d[id] in [Chemistry 221] [would be their] own. Academic dishonesty w[ould] not be

---

[3] Hariri subsequently dropped one of the four courses in which he enrolled in Fall 2014
(Statistics) prior to the end of the quarter. *See* Hariri Depo., 130:18-24.

tolerated in [Chemistry 221]. Cheating during any exam w[ould] be reported and the student w[ould] receive an 'F' for the exam." *Id.*

Hariri and PSU offer conflicting evidence as to whether Hariri sat for the Chemistry 221 final examination on December 8, 2014, with his fellow students. Hariri testified that he did so, and that he handed his completed examination to learning assistant Willis after he finished writing it. *See* Hariri Depo., 179:5-23. Hariri testified that Willis asked him for photographic identification, and that he replied that he did not have it on his person. *See id.* Hariri testified that Willis told him that the two of them should discuss the matter with Shusterman, but that Hariri observed that there were already students forming a line to speak with Shusterman, whereupon he left without exchanging further words with Willis, leaving his examination in Willis' possession. *See id.*

By contrast, Willis testified that in the latter half of the final examination period, a man of evident Asian descent whom Willis "did not recognize" walked up to him and handed him an examination bearing Hariri's name. Willis Depo., 11:3 – 12:9. Willis testified that he knew Hariri by sight, and knew that the man attempting to turn in the examination was not Hariri. *See id.*, 6:6-13, 11:14-22, 14:4-11. Willis testified that he asked the man to show his photographic identification, and that the man told him he had not been aware that he needed to bring it to the final examination. *See id.*, 11:18-24. Willis testified that he told the man he would need to speak with Shusterman and then began walking toward Shusterman, expecting the man to follow. *See id.*, 11:25 – 12:5. Willis testified that he looked over his shoulder to confirm that the man was following him only to discover that the man had left the examination room. *See id.* Willis testified that he then approached Shusterman, gave her the examination bearing Hariri's name,

and advised her that the man who had handed the examination in was not Hariri. *See id.*, 14:16 –

15:2. Shusterman testified consistently that Willis handed her an examination bearing Hariri's

name and told her that the person who handed it in had no photographic identification and was

not Hariri. *See* Stanford Decl., Exh. 2 (the Deposition of Gwen Shusterman (collectively with

Runkles-Pearson Decl., Exh. 2, "Shusterman Depo."), 16:3 – 17:18. Shusterman testified that

after receiving the examination bearing Hariri's name from Willis, she set the examination aside

for further consideration. *See id.*, 17:23 – 18:3.

    At some time after Hariri filed this lawsuit, a board-certified forensic document examiner

opined that the handwriting of the person who wrote the examination from December 8, 2014,

bearing Hariri's name differed significantly from Hariri's and had no forensically significant

similarities to Hariri's. *See* Declaration (#23) of Jacqueline Joseph dated February 29, 2016

("Joseph Decl."), ¶ 11. The forensic document examiner offered her opinion to the highest

possible degree of confidence, opining that the possibility that the handwriting was Hariri's was

entirely eliminated. *See id.*, ¶ 24. Hariri testified to the contrary that the examination from

December 8, 2014, bearing his name was written in his handwriting. *See* Hariri Depo., 181:21-

25. Hariri offers no expert opinion that there is any possibility that the handwriting on the

examination of December 8, 2014, could be his own. I note in this regard that numerous of the

dissimilarities between the handwriting of the person who wrote the examination of December 8,

2014, and the confirmed samples of Hariri's handwriting are readily apparent to the untrained

eye, including perhaps in particular the fact that Hariri always crosses his sevens in the confirmed

samples of his handwriting whereas the person who wrote the examination of December 8, 2014,

did not ever do so. *See* Joseph Decl., Exh. E.

Shusterman emailed Hariri later on December 8, 2014, to advise him that he had "committed a serious breach of the Student Conduct Code by having another individual come take [his] final exam." Shusterman Decl., Exh. 6. Shusterman advised Hariri that she would "record a zero" grade for the Chemistry 221 final examination and report the incident to the student conduct board. *Id.* Hariri responded via email that same day, suggesting that he had been the person who wrote the examination bearing his name, stating that he had been forced to leave the examination room immediately after completing his examination because he needed to visit his father in hospital following a surgical procedure. *See id.* Hariri wrote that his wallet had been in his car "and [he] would have went to the car and grabbed it if [he] had time but [he] really had to leave." *Id.* Shusterman responded that same day via email that the "LA saw the student that turned in the exam; it was not [Hariri]." *Id.* She reiterated that students were required, pursuant to a policy that had been announced on multiple occasions, to bring photographic identification to final examinations. *See id.*. Hariri responded that same day via email that he understood the photographic identification policy but had forgotten about it. *See id.*. He expressed willingness to take the examination, purportedly a second time, in Shusterman's presence. *See id.* Shusterman responded via email that same day that she was no longer on campus such that Hariri could not take the final examination that day, and that she would contact him again after speaking further with Willis. *See id.* Hariri responded via email that same day that he was willing to take the examination in Shusterman's presence the following day. *See id.*. Hariri additionally stated that he would "literally take [Willis] to court if he ruin[ed] [Hariri's] reputation over this," and attached his lawyer's card to his email message. *Id.* Shusterman contacted Willis via email later that same day to advise him that Hariri denied Willis'

account of events, and to inquire whether Willis was certain that the man who handed in the

examination bearing Hariri's name was not Hariri. *See id.*, Exh. 7. Willis responded via email

later that same day that he was "100% certain. The man who turned in the exam was Asian and

this is Mohammad [*sic*] Hariri," attaching a photograph of Hariri's face, apparently downloaded

from Hariri's Facebook page. *Id.*. Shusterman advised Hariri via email that same day that she

would permit Hariri to take the examination in her presence the following morning. *See id.*, Exh.

6. Later that same day, Shusterman reported the incident to the Dean of Students Office. *See id.*,

Exh. 10.

The following morning, December 9, 2014, Hariri took a different version of the

Chemistry 221 final examination in Shusterman's office and in her presence. *See* Hariri Depo.,

213:4-14; Shusterman Depo., 31:7 – 32:7; Shusterman Decl., ¶ 6, Exh. 3. Hariri showed

Shusterman his photographic identification at the time he took the examination on December 9,

2014. *See id.*

Domanic Thomas, at that time PSU's Senior Student Conduct Officer, conducted a

preliminary investigation of Shusterman's report and determined that there were grounds for

conducting a hearing in connection with the allegation that Hariri cheated on his Chemistry 221

final examination by sending another person to take the examination in his stead. *See*

Declaration (#25) of Nicole Morris dated March 1, 2016 ("Morris Decl."), Exh. 1 (the "Charge

Letter"). Thomas advised Hariri by letter that a hearing would take place on December 19, 2014,

and that he would serve as the Hearing Officer. *See id.* In addition, Thomas met with Hariri on

December 16, 2014, to discuss the allegations against him. *See* Hariri Depo., 201:12-21; *see also*

Runkles-Pearson Decl., Exh. 3 (the Deposition of Domanic Thomas (collectively with Stanford

Page 9 - OPINION AND ORDER

Decl., Exh. 3, and with the Declaration (#59) of Justin Steffen dated November 14, 2016

("Steffen Decl."), Exh. 6, "Thomas Depo."), 16:21 – 18:14. Thomas discussed with Hariri the

types of evidence that Hariri might offer in order to support his position that he was the man who

wrote the examination of December 8, 2014, bearing his name, including mobile phone records,

parking receipts, video surveillance tapes, and the names of students who might have seen him in

the examination room, and urged him to provide such evidence in connection with the scheduled

hearing. *See id.*, 16:1 – 21:10. At no time did Hariri ever produce any such evidence, or any

other evidence, in support of his position. *See id.*, 21:8-12.

On or around December 17, 2014, Shusterman determined to her own satisfaction that

Hariri had sent another person to write the Chemistry 221 final examination on his behalf, and

awarded him a grade of zero on the examination. *See* Shusterman Depo., 38:6 – 40:9. However,

Shusterman was prepared to revise the grade in the event Thomas ultimately concluded that it

was more likely than not that Hariri had written the final examination himself on December 8,

2014. *See id.*

Hariri did not attend the hearing set for Friday, December 19, 2014, but rather sent

Thomas, Shusterman, PSU general counsel, and other PSU officials an email message through

his then-attorney Kevin Brague, advising that Hariri would not attend the hearing and demanding

that he immediately be awarded an "A" grade on his Chemistry 221 final examination. *See*

Shusterman Decl., Exh. 9 ("Brague Message"). Hariri's attorney characterized the accusation of

academic misconduct as a failure to bring photographic identification to the final examination,

and asserted that such "[i]dentification was not available to Mr. Hariri because his license was

suspended and confiscated.'"[4]  *Id.*  Hariri's attorney stated that if Hariri's grade were not revised to an "A" by close of business on the following Monday, Hariri would "immediately" file an action seeking money damages against Shusterman.  *Id.*

On December 23, 2014, PSU assistant general counsel Krista Stearns responded via email to Hariri's counsel's message of December 19, 2014, requesting confirmation that Hariri did not intend to attend a hearing in connection with the charges against him, and that he preferred that PSU reach a final decision on the charges without consideration of any additional evidence Hariri might choose to offer them.  *See* Declaration (#55) of Krista S. Stearns dated October 20, 2016 ("Stearns Decl."), Exh. 1.  later that same day, Hariri's attorney responded in the affirmative that Hariri would not attend a hearing or provide further evidence in support of his position, and was "agreeable" with the prospect of Thomas reaching a final decision on the charges against him on the basis of the evidence already available to him.  *See id.*, Exh. 2.

On December 30, 2014, Thomas notified Hariri in writing that he had concluded based on a "preponderance of evidence" that Hariri had sent another person to write his Chemistry 221 final examination on December 8, 2014.  Morris Decl., Exh. 2.  Thomas further notified Hariri that he would be assessed a fee of $75, and suspended from PSU for a period of one year.  *See id.*  Thomas' letter further advised Hariri of his right to appeal the decision within ten days.  *See id.*

---

[4]  Hariri offers no explanation of his attorney's claim that identification was not available to him on December 8, 2014, because his license had been suspended and confiscated in light of Hariri's statement to Shusterman of December 8, 2014, that his identification was in his car and readily available during the examination period or in light of the fact that Hariri brought photographic identification with him when he sat for a different version of the final examination in Shusterman's presence on December 9, 2014.  I note, further, in this connection that Hariri provided Thomas with documentation establishing that the suspension of his license had been resolved in court on December 1, 2014.  *See* Runkles-Pearson Decl., Exh. 4.

Hariri timely requested appeal of the decision on January 4, 2015. *See id.*, Exh. 3. On January 20, 2015, PSU Interim Vice President of Enrollment Management and Student Affairs Dan Fortmiller upheld Thomas' decision of December 30, 2014. *See id.*, Exh. 4. In consequence, Hariri's zero grade on the Chemistry 221 final examination was left undisturbed, and Hariri received an overall grade of "D" in the class. *See* DuPont Decl., Exh. 1.

Beginning in or around autumn of 2014, Hariri applied to several dental schools. *See* Stanford Decl., Exh. 5; *see also* Hariri Depo., 223:1 – 237:17. All of the dental schools to which Hariri applied rejected his application. *See id.*. Some of the rejections came prior to the date Hariri's grades from the courses he took in Fall 2014 appeared on any transcript, and all other rejections came after Hariri had informed the dental schools by letter that his grade for Chemistry 221 was not yet available due to a "minor misundestanding" that would soon "be resolved" with Hariri receiving an "A" grade. *See id., see also id.*, Exhs. 6-15.

On February 2, 2015, by and through his present attorney, Hariri sent PSU a tort claim notice, for the first time raising the possibility that Hariri's zero grade on the Chemistry 221 final examination might have been motivated by race or national origin discrimination. *See* Stearns Decl., Exh. 3 (Hariri's "Tort Claim Notice"). The Tort Claim Notice advised PSU of Hariri's position that the events complained of herein raised concerns that Hariri suffered race and/or national origin discrimination and possible deprivation of his constitutional due process rights, and expressly put PSU on notice that, if the parties' dispute were not resolved informally, Hariri would bring an action against PSU "under 42 USC 1983 for violation of Mr. Hariri's constitutional and civil rights (as well as any analogous state law claims)." *Id.* at 4, *see also id.* at 2, 3. The Tort Claim Notice did not directly or indirectly reference the possibility that Hariri

might bring a claim alleging PSU's liability for negligence. *See id., passim.*

On February 7, 2015, PSU's assistant general counsel inquired whether Hariri would like to file a complaint with PSU's Office of Equity and Compliance, which is charged with addressing discrimination complaints at PSU. *See id.*, Exh. 4. By and through his counsel, Hariri declined to file such a complaint. *See id.*. PSU nevertheless conducted an internal investigation of the discrimination charge, and found no evidence of discriminatory animus. *See id.*

Hariri filed this action June 17, 2015.

### III.    PSU's Student Conduct Code

In 2014, PSU's Code of Student Conduct and Responsibility (the "Student Conduct Code") was codified at O.A.R. 577-031-0125 (2014) *et seq.* Pursuant to the Student Conduct Code, PSU faculty had available to them during the time material to Hariri's claims two sanctions that may be imposed in connection with academic dishonesty: "(a) Issuing a zero or a failing grade for the assignment for which the dishonesty was found; or (b) suspension or expulsion from the department, program, college or school. . . ." O.A.R. 577-031-0142(2) (2014). Faculty members at PSU "may submit a written Complaint to the Dean of Student Life alleging that a Student(s) has engaged in academic misconduct. Any charge should be submitted as soon as possible after the activity takes place, preferably within fourteen (14) Days of such activity." O.A.R. 577-031-0142(3) (2014).

When the Senior Conduct Officer has determined that [such] a complaint requires an investigation, the process will proceed as follows:

* * *

     (3)     The Senior Conduct Officer or other investigator will contact the Complainant and Respondent to gather statements, documents, digital records, and other information related to the complaint. The investigator will interview relevant witnesses. The Complainant and Respondent will be kept informed of the status of the investigation.

     (4)     Complaints will be investigated and resolved, and parties will be notified of the outcome promptly, but not later than sixty (60) Days from the date of the complaint, absent extenuating circumstances.

     (5)     Hearing result notifications will be provided to Complainants and Respondents consistent with the Family Educational Rights and Privacy Act and other applicable laws.

O.A.R. 577-031-0141(3)-(5) (2014). Senior Conduct Officers are without authority to effect modifications to PSU student grades. *See* Stearns Decl., ¶ 9; *see also* O.A.R. 577-031-0140 (2014). Senior Conduct Officers make their determinations in connection with complaints of academic dishonesty "based upon a preponderance of the evidence (which means whether something is 'more likely than not')." O.A.R. 577-031-0140(5)(f) (2014).

PSU students may appeal sanctions imposed by a Senior Conduct officer to the Vice President for Enrollment Management and Student Affairs. *See* O.A.R. 577-031-0143 (2014). PSU students may also may appeal decisions regarding course grades to the Academic Appeals Board. *See* Stearns Decl., ¶ 10.

## ANALYSIS

As a preliminary matter, before turning to the parties' arguments regarding Hariri's claims, I address the parties' dispute over the question whether it was Hariri or another person who wrote the exam dated December 8, 2014, that bears Hariri's name. The evidence that the examination of December 8, 2014, was written by a person other than Hariri is extremely strong, and the

contrary evidence that the examination was written by Hariri is both thin and highly implausible. I nevertheless assume *arguendo* (for purposes of PSU's motion for summary judgment only) that a finder of fact could reasonably credit Hariri's testimony that he wrote the examination of December 8, 2014, could reasonably disbelieve Willis' contrary testimony, and could reasonably disbelieve the opinion testimony of PSU's forensic expert that the dissimilarities between Hariri's handwriting and the handwriting of the person who wrote the examination of December 8, 2014, were such that there is no possibility that the same person wrote both.  On that *arguendo* assumption, I find for purposes of PSU's motion for summary judgment only that Hariri wrote the examination of December 8, 2014, that bears his name.  In making this finding, I do not suggest that, in the event Hariri's claims were submitted to a jury and the jury were to find on the basis of the evidence of record that Hariri wrote the examination of December 8, 2014, I would decline to overturn the jury's finding pursuant to Federal Civil Procedure Rule 50(b).

## I.  Hariri's Title VI Discrimination Claim

"Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, provides in pertinent part that 'no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial aid.'" *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1446 (9th Cir. 1994), *quoting* 42 U.S.C. § 2000d.  As noted above, the parties do not dispute that PSU receives some federal funding.

> To state a claim for damages under 42 U.S.C. § 2000d, *et seq.*, a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance. *Wrenn v. Kansas*, 561 F. Supp. 1216, 1221 (D.C. Kan. 1983) (*citing Jackson v. Conway*, 476 F. Supp. 896, 903 (E.D. Mo. 1979)).  Although the plaintiff must prove intent at trial, it need not

be pled in the complaint. *Wrenn*, 561 F. Supp. at 1221. *Compare Jackson*, 476 F. Supp. at 903 (no proof of intent is required if plaintiff seeks only injunctive relief).

> There is no requirement that plaintiff plead that he was an intended beneficiary of the federally funded program in which defendants are alleged to have participated. *Wrenn*, 561 F. Supp. at 1221. *Cf. Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1234-35 (7th Cir. 1980) (In reviewing complaint under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which is modeled after and enforced in the same manner as 42 U.S.C. § 2000(d), court should not define program, and therefore identify its intended beneficiaries, in a "very narrow fashion."); *Byers v. Rockford Mass Transit Dist.*, 635 F. Supp. 1387, 1390 (N.D. Ill. 1986) ("As long as some federal funding is alleged in § 504 actions . . ., the program specificity issue is more properly the subject of a summary judgment motion.").

*Id.* at 1447 (internal modifications omitted). As noted above, Hariri seeks both money damages and injunctive relief in connection with his Title VI claim.

The courts of the Ninth Circuit apply the *McDonnell Douglas* burden-shifting framework when considering pretrial challenges to Title VI claims. *See Rashdan v. Geissberger*, 764 F.3d 1179, 1181 (9th Cir. 2014). Under that framework:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 1183, *quoting Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). The "requisite degree of proof necessary to establish a *prima facie* case for a Title VI[] claim on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* 17 1183-1184, *quoting Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (internal modifications omitted).

It is Hariri's position that he has stated a *prima facie* case of discrimination based on his status as a person of Arab descent, the fact that he was accused of cheating on the Chemistry 221 final examination based in part on the word of his learning assistant Willis, a Caucasian person, and the fact that Shusterman and other PSU employees believed the version of events proffered by Willis and disbelieved the version of events proffered by Hariri. Hariri expressly categorizes Willis as a "similarly situated non-minority student" for purposes of stating his *prima facie* case of race or national origin discrimination. Hariri's position is untenable, and the evidence upon which he expressly and implicitly relies is insufficient to meet even the minimal threshold required for stating a *prima facie* case under the *McDonnell Douglas* framework.

As an initial matter, there is no material sense in which Willis was "similarly situated" to Hariri. Hariri is a student accused of sending another student to write a final examination on his behalf and under his name; Willis is not. Willis is therefore not a comparator of Hariri's for purposes of showing that a non-minority student accused of cheating under similar circumstances would have been believed where Hariri was not believed, or would have received different or lesser discipline than the discipline meted out to Hariri.

Moreover, the fact that Shusterman and other PSU employees credited Willis' version of events and discredited Hariri's lend no support to the conclusion that Shusterman, PSU, or any PSU employee harbored improper discriminatory animus against Hariri in particular or against persons of Arab descent in general. Hariri was a student in a large class with a strong incentive to do well in a course he had taken previously, and in which he had previously performed poorly. Willis, by contrast, was engaged for the purpose of proctoring examinations and preventing cheating from taking place. Willis lacked any conceivable motive to lie about what he observed

on December 8, 2014 (other than racial animus, for which there is no independent evidence whatsoever), whereas Hariri had such a motive. In addition, Willis' version of events received apparent corroboration from the apparent dissimilarities between his handwriting on December 8, 2014, and his confirmed handwriting from other occasions, whereas Hariri's version of events was rendered highly implausible by those same dissimilarities. Under the circumstances, the fact that Willis' version of events was credited relative to Hariri's contrary version does not support a finding that prohibited discrimination occurred.

Other than the foregoing, Hariri offers no direct evidence that defendant or any person working on its behalf harbored discriminatory animus against Hariri, and no evidence that he ever received different treatment than similarly situated students of different racial or national heritage. As such, he cannot state a *prima facie* case of discrimination under Title VI.

Even if Hariri were deemed to have stated a *prima facie* case, PSU has offered a legitimate, nondiscriminatory reason for awarding Hariri a grade of zero on the Chemistry 221 final examination – the reasonable belief of Shusterman and Thomas, reached after consideration of all available material evidence (including, at different stages in the process of investigating the charges against Hariri, Willis' account of the events of December 8, 2014, the apparent dissimilarities between Hariri's handwriting on December 8, 2014, and his handwriting on other occasions, and the unexplained inconsistencies and modifications in Hariri's account of the events of December 8, 2014, including his reliance on the false claim that his drivers license had been suspended and confiscated on that day), that Hariri cheated on the final examination – and Hariri has failed to meet his burden to create a material question of fact as to whether that reason was pretextual. First, Hariri argues that it is so implausible that Willis could have remembered

his features and distinguished another person from him based on appearance alone that to credit

Willis' claim to know what he looked like is evidence of pretext. This purported implausibility is

belied by Hariri's own testimony as to his confidence that Willis could recognize him by sight,

*see* Hariri Depo., 189:21-25, and that he himself recognized Willis by sight, *see id.*, 154:8-9. In

addition, Hariri's argument for implausibility becomes significantly less persuasive when account

is taken of the fact that Willis was the learning assistant for a "neighborhood" of only

approximately 20 of the students in Chemistry 221, and not for all students in the class. Hariri's

argument that it is implausible that Willis could have recognized him by sight provides no

support for the conclusion that PSU's proffered reason was pretextual.

   Second, Hariri argues that the fact that Shusterman had already awarded Hariri a grade of

zero as of December 17, 2014, two days before the scheduled hearing of December 19, 2014,

establishes that PSU's investigation was a sham and its proffered reason pretextual. However,

PSU has proffered evidence that Shusterman was prepared to modify Hariri's grade in the event

the investigation suggested that Hariri might have written his own examination on December 8,

2014, *see* Shusterman Depo., 38:6 – 40:9, and Hariri has offered no contrary evidence. In

addition, at the time Shusterman determined that Hariri had not written his own examination on

December 8, 2014, she had available to her compelling evidence that her determination was

accurate, including Willis' account of events and the apparent dissimilarities between Hariri's

handwriting on December 8, 2014, and his handwriting on other occasions. Under the

circumstances, Hariri's argument based on the timing of Shusterman's decision to award him a

grade of zero provides no support for the conclusion that PSU's proffered reason was pretextual.

   Third, Hariri argues that the fact that Thomas credited Willis without requiring him to

offer proof of the accuracy of his account while urging Hariri to offer evidence to corroborate his contrary account amounts to evidence that PSU's proffered reason was pretextual. However, as discussed above, Thomas could reasonably believe that Willis lacked any incentive to mischaracterize the events of December 8, 2014, and to believe that Hariri had such an incentive, and could reasonably infer from the apparent dissimilarities between Hariri's handwriting on December 8, 2014, and his handwriting on other occasions that Hariri did not write the examination of December 8, 2014, bearing his name. Thomas also had available to him the fact that Hariri had indicated that he would provide evidence that would corroborate his claims but ultimately failed to identify any such evidence, and could reasonably infer from the contradictions and inconsistencies in Hariri's account that Hariri was not accurately describing the events of December 8, 2014. Under those circumstances, the fact that Thomas disbelieved Hariri's story does not provide grounds for concluding that PSU's proffered reason was pretextual.

Because Harir has neither adduced sufficient evidence to establish even a minimal *prima facie* case of discrimination under Title VI, and because even if he were deemed to have done so, he has not met his burden to create a material question of fact as to whether PSU's proffered non-discriminatory reason for its conduct was pretextual, PSU is entitled to summary judgment in its favor in connection with Hariri's Title VI claim.[5]

## II.    Hariri's Section 1983 Procedural Due Process Claim

It is Hariri's position that he was denied due process in connection with PSU's decision to

---

[5] In consequence, I need not address the parties' arguments as to whether, in the alternative, Hariri could be entitled to award of money damages in connection with his Title VI claim.

allow Shusterman to award him a grade of zero on his Chemistry 221 final examination because

Thomas both conducted PSU's investigation of the charges against Hariri and made the final

decision regarding those charges, and because Hariri had effectively no right of appeal from

Thomas' decision.[6] To prevail on a procedural due process claim under Section 1983, a plaintiff

must establish: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation

of the interest by the government; and (3) lack of process." *Wright v. Riveland*, 219 F.3d 905,

913 (9th Cir. 2000) (internal modifications omitted), *quoting Portman v. County of Santa Clara*,

995 F.2d 898, 904 (9th Cir. 1993).  The "lack of process" element can also be formulated as

"denial of adequate procedural protection." *Krainski v. State ex rel. Bd. of Regents*, 616 F.3d

963, 970 (9th Cir. 2010), *citing Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149

F.3d 971, 982 (9th Cir. 1998).

> The question of "what process is due" is more easily asked than answered.  As the
> Supreme Court has frankly acknowledged, "for all its consequence, 'due process'
> has never been, and perhaps never can be, precisely defined." *Lassiter v.
> Department of Social Servs.*, 452 U.S. 18, 24, 68 L. Ed. 2d 640, 101 S. Ct. 2153
> (1981).  Rather, the phrase "expresses the requirement of 'fundamental fairness,' a
> requirement whose meaning can be as opaque as its importance is lofty." *Id.*  As a
> result, deciphering and applying the Due Process Clause is, at best, "an uncertain
> enterprise." *Id.*
>
> Precisely what procedures the Due Process Clause requires in any given case is a
> function of context.  After all, "unlike some legal rules," due process "is not a
> technical conception with a fixed content unrelated to time, place and
> circumstances." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S.
> 886, 895, 6 L. Ed. 2d 1230, 81 S. Ct. 1743 (1961) (*quoting Joint Anti-Fascist
> Comm'n v. McGrath*, 341 U.S. 123, 162, 95 L. Ed. 817, 71 S. Ct. 624 (1951)
> (Frankfurter, J., concurring)) (quotation marks omitted).  Rather, **it "is flexible
> and calls for such procedural protections as the particular situation**

---

[6] Hariri concedes that PSU procedures provide a mechanism for appeal from disciplinary
decisions, and that he availed himself of that mechanism, but argues that the right to appeal was
limited such that it was a foregone conclusion that his appeal would fail.

demands." *Morrissey* [*v. Brewer*], 408 U.S. [471,] 481 [(1972)]. As this court has observed, "the determination of what procedures satisfy due process [in a given situation] depends upon an analysis of the particular case in accordance with the three-part balancing test outlined in *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976)." *Orloff v. Cleland*, 708 F.2d 372, 378-79 (9th Cir. 1983) (parallel citations omitted). In *Mathews*, the Supreme Court stated:

> **Identification of the specific dictates of due process generally requires consideration of three distinct factors. First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.**

*Mathews*, 424 U.S. at 335.

*Brewster*, 149 F.3d at 983 (emphasis supplied; modifications original). It is nevertheless well established that "[d]ue process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the [governmental] action and afford them an opportunity to present their objections." *Al Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*, 686 F.3d 965, 985 (9th Cir. 2012), *quoting United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (U.S. 2010), *quoting Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). In the academic context, the United States Supreme Court has found that the due process inquiry by its "very nature . . . negates any concept of inflexible procedures universally applicable to every imaginable situation." *Goss v. Lopez*, 419 U.S. 565, 578 (1975), *quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961), but that "[a]t the very minimum, . . . students facing suspension and the consequent interference with a protected property interest must be given *some* kind of notice and afforded *some* kind of hearing. 'Parties

whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Id.* at 579 (emphasis original), *quoting Baldwin v. Hale*, 1 Wall. 223, 233 (1864).

PSU appears to concede that Hariri has a liberty and/or property interest at stake. This is appropriate, because it is well established that students have a property interest in the benefits of formal education and a liberty interest in avoiding a reputation for academic dishonesty. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 575-576 (1975). PSU does challenge whether Hariri suffered any deprivation of his constitutional right to due process in connection with the deprivation of those property and liberty interests.

It is undisputed that Hariri received notice of the specific charges against him and of their purported factual basis, that he had the opportunity to speak with Thomas regarding those charges and his response to them, that he was notified that there would be a hearing in connection with the charges, and that he was invited to be present at that hearing and to offer evidence and argument in opposition to the charges. It is further undisputed that, although Hariri declined to be present at the hearing, he did so knowingly, after it was explained to him that in the event he did not appear and did not offer argument or evidence that might tend to exonerate him, a decision would be reached on the basis of the available evidence only. Neither Hariri's election not to appear at the hearing nor his failure to offer evidence or argument that he would have had an opportunity to present had he attended the hearing render the process available to him inadequate. Constitutional due process does not require that ultimate disciplinary decisions be made by persons who did not investigate the charges against a student, and they do not require any right to appeal from disciplinary decisions on any particular grounds. *See id., passim.* The

Page 23 - OPINION AND ORDER

evidence of record establishes that Hariri received all process to which he was due under the Fourteenth Amendment in connection with the discipline PSU imposed against him. *See id.*

Moreover, even if Hariri had adduced evidence tending to establish that he suffered an actionable deprivation of his procedural due process rights, because PSU is an arm of the state of Oregon, it is entitled to Eleventh Amendment immunity from suit under Section 1983. *See, e.g., Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1035 (9th Cir. 1999) (reaching that conclusion in connection with the Oregon State Board of Higher Education), *see also Broyles v. Or. State Bd. of Higher Educ.*, Case No. 03:11-CV-144-HZ, 2012 U.S. Dist. LEXIS 38383 (D. Or. Mar. 20, 2012) (reaching that conclusion regarding PSU in particular), *quoting Hagel v. Portland State Univ.*, 237 Fed. Appx. 146, 148 (9th Cir. 2007) (unpublished disposition) (same).

For the foregoing reasons, PSU is entitled to summary judgment in its favor in connection with Hariri's procedural due process claim.

## III.    Hariri's Negligence Claim

Because Hariri's Title VI discrimination claim and Section 1983 procedural due process claim are without merit, it is within this court's discretion to deny PSU's motion for summary judgment as moot to the extent it addresses Hariri's negligence claim, which arises under Oregon law, and to dismiss that claim without prejudice for lack of federal subject-matter jurisdiction. *See* 28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction over a [state-law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie- Mellon Univ. v Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of the factors to be considered under the pendent jurisdiction doctrine--judicial economy,

convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims"). Here, however, in light of the facts that this case has been proceeding in this court since June 17, 2015, that the parties have fully briefed the merits of PSU's motion to the extent it addresses Hariri's negligence claim, that Hariri specifically elected to bring his claims in federal court, and that PSU seeks adjudication of the merits of the negligence claim in this court and does not seek its dismissal on jurisdictional grounds, the factors of judicial economy and convenience suggest that the parties' dispute over the negligence claim could appropriately be decided here, and the factors of fairness and comity do not militate to the contrary. I therefore exercise discretion under Section 1367(c)(3) to retain supplemental jurisdiction over Hariri's negligence claim notwithstanding my finding that Hariri's federal claims are subject to dismissal with prejudice.

The Oregon Tort Claims Act ("OTCA") provides that "no action may be maintained on a tort claim against a public body unless the public body receives timely notice of claim." *Heng-Nguyen v. Tigard-Tualatin Sch. Dist. 23J*, 275 Or. App. 724, 726 (2015), *citing* Or. Rev. Stat. § 30.275(1). "The notice requirement may be satisfied in any of four ways: (1) the plaintiff gives the public body formal notice of claim; (2) the public body receives actual notice of claim; (3) the plaintiff commences an action on the claim; or (4) the public body pays all or part of the claim." *Id.*, *citing* Or. Rev. Stat. § 30.275(3). Under the circumstances applicable here, such notice must be provided to the public body within 180 days after the loss or injury out of which the claim arises, *see* Or. Rev. Stat. § 30.275(2), subject to a discovery rule providing that such 180-day period does not begin to run until the plaintiff knows or, in the exercise of reasonable care should know, of the alleged loss or injury, *see Dunn v. City of Milwaukie*, 270 Or. App. 478,

484 (2015) (citations omitted). Here, Hariri appears to take the position that his counsel's Tort

Claim Notice letter of February 2, 2015, constituted either formal or actual timely notice of his

intention to bring a negligence claim against PSU or, in the alternative, that his amended

complaint of July 12, 2016 (by and through which he first attempted to state a claim for

negligence in this action), constituted timely commencement of an action on a claim for

negligence against PSU for OTCA notice purposes.

> Actual notice is defined under the OTCA as:

> [A]ny communication by which any individual to whom notice may be given as
> provided in subsection (5) of this section or any person responsible for
> administering tort claims on behalf of the public body acquires **actual knowledge
> of the time, place and circumstances giving rise to the claim**, where the
> communication is such that a reasonable person would conclude that a particular
> person intends to assert a claim against the public body or an officer, employee or
> agent of the public body.

Or. Rev. Stat. § 30.275(6) (emphasis supplied). The Oregon Supreme Court has determined that

the OTCA notice requirement may be satisfied by "actual notice" where such notice specifically

provides "a defendant with the facts (*i.e.*, time, place, and circumstances) that *relate to the*

*specific claim or claims that a plaintiff ultimately asserts*" and puts the defendant on notice of the

plaintiff's intention to bring a claim against it. *Flug v. Univ. of Or.*, 335 Or. 540, 553 (2003)

(emphasis supplied); *see also Heng-Nguyen*, 275 Or. App. at 729. "Formal notice" similarly

satisfies the OTCA notice requirements only where it describes the time, place and circumstances

giving rise to the claim actually at issue. *See* Or. Rev. Stat. § 30.275(4); *see also Hughes v. City*

*of Portland*, 255 Or. App. 271, 282 (2013). Because Hariri's Tort Claim Notice to PSU made no

direct reference to negligence and did not describe circumstances either constituting negligence

or suggesting any possibility that a negligence claim might lie, it was insufficient to put PSU on

"actual notice" or "formal notice" of his negligence claim.

Moreover, analysis of Hariri's allegations in support of his negligence claim establishes that it arises out of facts known to him by not later than January 20, 2015, when he learned that his appeal from Thomas' decision of December 30, 2014, had been denied (*i.e.*, Thomas' alleged failure to take any steps to verify the truthfulness of Willis' statements, Thomas' alleged failure to interview other students who might have observed Hariri writing the examination of December 8, 2014, Thomas' alleged failure to determine Shusterman's reasons for not grading Hariri's examination of December 9, 2014, in its entirety, Thomas' alleged failure to investigate any possible ulterior motives Shusterman might have harbored for failing to award Hariri a grade based on the examination of December 9, 2014, Shusterman's election to credit Willis' version of events over Hariri's, and PSU's failure to award Hariri a grade based on the examination of December 9, 2014, *see* Amended Complaint, ¶¶ 21-22). In consequence, the 180-day period began running as of January 20, 2015, and OTCA notice of a negligence claim arising out of those facts could be timely provided at any time from that date until July 19, 2015. Because Hariri did not file his negligence claim until July 12, 2016, it cannot constitute timely notice of his negligence claim for OTCA purposes. *See* Or. Rev. Stat. § 30.275(2); *Dunn*, 270 Or. App. at 478.

Because Hariri failed to comply with the notice requirements of the OTCA in connection with his negligence claim, he is barred from maintaining a cause of action for negligence against PSU. In consequence, PSU's motion should be granted as to Hariri's negligence claim.

Even if Hariri had satisfied the OTCA notice requirements in connection with his negligence claim, he has failed to state a cause of action for negligence under Oregon law arising

out of the complained-of conduct. To state a claim for negligence under Oregon common law, a plaintiff must show that the defendant owed the plaintiff a duty, that the duty was breached, and that the breach caused the plaintiff harm. *See, e.g., Fazzolari v. Portland School Dist.*, 303 Or. 1, 14-17 (1987). In the absence of a specific duty created, defined, or limited by a specified status, relationship or standard of conduct, "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Id.* at 17. Specifically, in the absence of a special relationship giving rise to a specific duty of care, to state a claim for negligence under Oregon law a plaintiff must allege:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Solberg v. Johnson*, 306 Or. 484, 490-491 (1988), *citing Fazzolari*, 303 Or. 1. Although reasonableness is generally a question of fact to be determined by a jury, where there is no doubt that a defendant's conduct was reasonable, the court may resolve the question without submitting it to a trier of fact. *See, e.g., Thurman v. Thomas*, 70 Or. App. 159, 162 (1984), *citing Hamilton v. State*, 42 Or. App. 821, 828-829 (1979). Here, Hariri concedes that he was not in a "special relationship" with PSU, such that a claim for negligence can lie only if the defendant's conduct created a foreseeable risk that he would suffer the harm he did, and if PSU's conduct was unreasonable in light of that risk.

On the *arguendo* assumption that it was Hariri who wrote the examination of December

8, 2014, the harm Hariri suffered was being treated as though he had cheated on his Chemistry

221 final examination when he had not in fact done so. The questions for the court, therefore,

are whether any of the complained-of conduct created a foreseeable risk that a student like Hariri

would be found to have sent another student to take his final examination when he in fact had not

done so, and whether PSU's conduct was unreasonable in light of any such risk. As noted above,

the material complained-of conduct is Thomas' alleged failure to take any steps to verify the

truthfulness of Willis' statements, Thomas' alleged failure to interview other students who might

have observed Hariri writing the examination of December 8, 2014, Thomas' alleged failure to

determine Shusterman's reasons for not grading Hariri's examination of December 9, 2014, in its

entirety, Thomas' alleged failure to investigate any possible ulterior motives Shusterman might

have harbored for failing to award Hariri a grade based on the examination of December 9, 2014,

Shusterman's election to credit Willis' version of events over Hariri's, and PSU's failure to award

Hariri a grade based on the examination of December 9, 2014, see Amended Complaint, ¶¶

21-22. Hariri cannot state a claim for negligence arising out of any of that conduct.

As to Thomas' alleged failure to take any steps to verify the truthfulness of Willis'

statements and Shusterman's election to credit Willis' version of events over Hariri's, I agree with

Hariri's implicit position that failure to verify an accusation of cheating would create a

foreseeable risk that the accused student will be found guilty of the charge without sufficient

basis. However, a finder of fact could not reasonably conclude on the basis of the evidentiary

record here that PSU behaved unreasonably with respect to that risk. First, Hariri's handwriting

on the examination of December 8, 2014, differs in multiple respects from his handwriting on all

other occasions from which samples are available, and as discussed above, those differences are

apparent both to the untrained and to the expert eye. It was reasonable for Thomas, Shusterman, and/or PSU to treat the apparent difference between Hariri's handwriting when he wrote the examination of December 8, 2014, and his handwriting on other occasions as tending to corroborate Willis' version of events. Second, Willis was a learning assistant tasked with preventing cheating on the Chemistry 221 final examination, and as such he had no incentive to invent an accusation against Hariri and every incentive to fulfill his obligations without such confabulation, whereas Hariri had an apparent incentive to lie in order to avoid the accusation of cheating, such that it was reasonable for Thomas, Shusterman, and/or PSU to find Willis more credible than Hariri in this context. Third, Thomas, Shusterman, and/or PSU could reasonably have inferred both from Hariri's assurances that he would collect exculpatory evidence and subsequent failure to proffer even a modicum of such evidence and from Hariri's threats of litigation in the course of the investigation of his conduct that Hariri was not a credible reporter of events. In light of the foregoing, a finder of fact could not reasonably conclude that Thomas, Shusterman, and/or PSU were unreasonable in crediting Willis over Hariri, and Hariri's negligence claim cannot survive summary judgement to the extent so premised.

As to Thomas' alleged failure to interview other students who might have observed Hariri writing the examination of December 8, 2014, again, I agree with Hariri's implicit position that failure to interview witnesses with knowledge of the facts underlying charges of academic dishonesty would create a foreseeable risk that the accused student will be found guilty of the charge without sufficient basis. However, in light of the fact that Thomas urged Hariri to produce the names of such witnesses and that Hariri failed to produce any such names, a finder of fact could not reasonably conclude that Thomas and/or PSU were unreasonable in failing to

Page 30 - OPINION AND ORDER

interview witnesses that Hariri failed to identify.  In consequence, Hariri's negligence claim cannot survive summary judgement to the extent premised on such failure.

As to Thomas' alleged failure to determine Shusterman's reasons for not grading Hariri's examination of December 9, 2014, in its entirety, Thomas' alleged failure to investigate any possible ulterior motives Shusterman might have harbored for failing to award Hariri a grade based on the examination of December 9, 2014, and PSU's failure to award Hariri a grade based on the examination of December 9, 2014, on the *arguendo* assumption that failure to investigate possible ulterior motives a professor might harbor for crediting an accusation of academic dishonesty might foreseeably create a risk that the accused student will be found guilty of the charge without sufficient basis, for the same reasons discussed above in connection with Thomas' decision to find Willis more credible than Hariri, a finder of fact could not reasonably conclude that it was unreasonable for Thomas and/or PSU to conclude that Hariri had in fact cheated on his Chemistry 221 final examination, or to subject him to the consequences of such misconduct. Hariri's negligence claim therefore cannot survive dismissal to the extent premised on such failures.

For the foregoing reasons, PSU is entitled to summary judgment in its favor in connection with Hariri's negligence claim.[7]

## CONCLUSION

For the reasons set forth above, PSU's motion (#54) for summary judgment is granted in

/ / /

---

[7] In consequence, I need not address the parties' arguments as to whether PSU is immune from a cause of action sounding in negligence under Or. Rev. Stat. § 30.265(6).

its entirety and summary judgment is awarded in PSU's favor as to each of Hariri's claims.  A

final judgment will be prepared.


Dated this 2nd day of March, 2017.

Honorable Paul Papak
United States Magistrate Judge

Page 32 - OPINION AND ORDER